Filed 12/2/20  P. v. Sandoval CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>EMILIO SANDOVAL,<br><br>　　　　Defendant and Appellant. | B294737<br><br>(Los Angeles County<br>Super. Ct. No. PA090295) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.

In January 2018, fourteen-year-old M.M. was walking to meet his mother when defendant and appellant Emilio Sandoval (defendant) approached him holding a 12-inch knife. Defendant told M.M. to hand over his watch or he would kill M.M., and defendant jabbed the knife toward M.M. twice from a distance of about three feet. Defendant then cut his own arm with the knife and walked away. A jury convicted defendant of one count of assault with a deadly weapon other than a firearm and one count of criminal threats, with the latter committed while personally using a deadly and dangerous weapon. We consider whether the trial court prejudicially erred in instructing the jury that the knife could be a deadly weapon either inherently or as-used, whether there is substantial evidence the knife was deadly as-used, and whether the trial court erred by excluding testimony about defendant's mental health history and his mental illness diagnoses rendered months after the date of the offense.

## I.  BACKGROUND

### A.    *The Charges Against Defendant*

The Los Angeles County District Attorney charged defendant with three crimes: (1) attempted second degree robbery in violation of Penal Code section 664/211 (count 1);[1] (2) criminal threats in violation of section 422, subdivision (a) (count 2); and (3) assault with a deadly weapon in violation of section 245, subdivision (a)(1) (count 3). The information further alleged defendant personally used a deadly and dangerous weapon, a

---

[1]    Undesignated statutory references that follow are to the Penal Code.

knife, in the commission and attempted commission of counts one and two.

### B. Relevant Pretrial Proceedings

Prior to trial, the superior court referred defendant for a psychological evaluation. The assessment was performed by Dr. Catherine Scarf in May 2018. In the course of the assessment, Dr. Scarf reviewed various documents related to the case, including the arraignment hearing transcript and arrest report. Dr. Scarf also interviewed defendant and reported, among other things, that during the interview defendant's thought process was linear and goal-directed, and there was no evidence of psychotic process.

During the interview, defendant denied current suicidal ideation but reported he had attempted suicide in the past. Defendant declined to discuss his previous suicide attempt. Defendant reported he had been admitted to a psychiatric hospital in 2018, which he attributed to being high on methamphetamine, and he reported he had previously been diagnosed as suffering from bipolar disorder. Defendant stated he had problematic alcohol abuse and had undergone rehabilitation, and he also reported heroin and methamphetamine use.

Dr. Scarf administered various tests and concluded defendant's intellectual abilities were likely in the high-average range and his reading skills were in the average range. Dr. Scarf also concluded defendant met the criteria for diagnosis with unspecified anxiety disorder and stimulant use disorder.

The prosecution moved in limine to exclude Dr. Scarf from testifying at trial.[2]  The prosecution argued Dr. Scarf's opinion would not be relevant to a jury's determination of whether defendant was able to form the requisite intent at the time of the offense.  The trial court granted the prosecution's motion in limine and excluded the testimony under Evidence Code section 352.  The court stated the testimony was not relevant, would unduly consume time, and had no probative value because it did not deal with the events that allegedly transpired on January 23, 2018.  Instead, Dr. Scarf could testify only to what she observed when she interviewed defendant in May 2018.  As a result, the testimony did not go to any defense that could be proffered to the jury and could only serve to confuse the issues to be decided at trial.

### C.    Trial

The prosecution presented testimony from M.M. and two Los Angeles Police Department officers during its case in chief.  Defendant testified during the defense case.

### 1.    The facts as established by prosecution witnesses

Around 2:30 p.m. on January 23, 2018, fourteen-year-old M.M. was walking toward a 99-cent store to help his mother with some bags when defendant appeared about six feet in front of him.  Defendant was holding a knife that was about 12 inches

---

[2]    Though the reporter's transcript of the hearing suggests the prosecution filed a written motion, the motion itself is not included in the appellate record.

4

long, and the knife had some blood on it. Defendant approached M.M. and, when he (defendant) was about three feet away, told M.M. to hand over his watch or defendant would kill M.M. Defendant was pointing the knife toward M.M. at the time and jabbed the knife toward M.M. twice. During the jabbing motions, the knife was about two feet away from M.M. M.M. thought defendant would kill him if he did not hand over his watch, but M.M. was in shock and froze because he did not know how to react.

After threatening M.M. and jabbing the knife at him, defendant cut his own right arm with the knife twice while looking at M.M. Defendant then started walking away, heading toward a liquor store. Defendant walked by M.M., passing within about two feet of him, as he did so. M.M. then called the police.

Los Angeles Police Department Officers apprehended defendant later that day, and M.M. identified defendant. M.M. had nightmares for about a week after the incident.

### 2. *Evidentiary ruling on defendant's testimony*

Before defendant testified, the People moved under Evidence Code section 402 to exclude any testimony regarding defendant's prior mental health history or drug use, unless it related to the day of the offense. Defendant argued his prior hospitalizations were relevant to his state of mind, noting mental health issues do not develop overnight. The court granted the People's motion, ruling defendant could not testify to any prior drug usage, mental health issues he may have suffered, or any hospitalizations or psychiatric care received before or after the offense, clarifying that the only relevant issue was defendant's state of mind and mental capacity on the day of the incident.

5

### 3. Defendant's testimony and his post-apprehension statements

Defendant testified he cut his arm on the day in question to make himself bleed.[3] Defendant felt like he wanted to kill himself and was cutting himself both to alleviate pain and to work up to suicide.

Defendant did not recall encountering M.M. or pointing a knife at him. Defendant recalled that at the time of the incident, he was walking down the street with a 10 to 12-inch knife, on his way to get a beer, and muttering "Watch, I'm going to kill myself" to himself as he went. When the police stopped him later that day, defendant did not know why they did so.

Defendant spoke to Officer Banuelos of the Los Angeles Police Department after his arrest (the interaction was captured by the officer's body-worn video camera). Defendant denied committing a robbery, denied demanding a watch, and denied threatening to kill anyone. Defendant admitted he had a knife and had cut himself with a knife, but he said he was not someone who steals. Defendant said he was mumbling to himself and might have been misunderstood.

### 4. Jury instructions

The court gave the jury two instructions on what qualifies as a deadly weapon. One was based on former CALCRIM No. 875. In pertinent part, the instruction as given stated "[a] *deadly weapon* other than a firearm is any object, instrument, or weapon

---

[3] During his testimony, defendant admitted to having a prior misdemeanor conviction in 2015.

6

that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." The other instruction was based on former CALCRIM No. 3145. In pertinent part, that instruction stated "[a] *deadly or dangerous weapon* is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

### 5. Closing argument

During closing argument, the prosecution commented on what qualifies as a deadly weapon: "A deadly or dangerous weapon is any object, instrument, or weapon that is inherently deadly or dangerous or one that can be used in a manner that would cause great bodily injury. [¶] I don't think there's anyone that doesn't know that a knife is capable of bodily injury, that a knife can be used as a dangerous or deadly weapon. You heard it from the defendant himself, he had a knife, 12-inch knife, that means it's a deadly weapon." Later, when addressing the assault with a deadly weapon charge, the prosecutor returned to the same general subject and argued, "the defendant did an act with a deadly weapon. He did, he was wielding this steak knife, and he made a jabbing motion toward the victim twice."

### D. Verdict and Sentencing

The jury deadlocked on the attempted robbery charge (count 1), and the court declared a mistrial on that count (later dismissing it). The jury found defendant guilty of the criminal threats charge (count 2), and further found defendant personally used a knife, a deadly and dangerous weapon, in the commission

7

of the offense.  The jury also found defendant guilty of the crime of assault with a deadly weapon (count 3).

The trial court sentenced defendant to the mid-term of three years in state prison on count 3.  The court sentenced defendant to the mid-term of two years on count 2, plus one year for the knife allegation, for a total of three years as to count 2—to run concurrently with the sentence on count 3.

## II.  DISCUSSION

Reversal is not required for any of the three reasons defendant argues.  First, the People rightly concede the trial court's instruction on what constitutes a deadly weapon was defective because the knife defendant had cannot be considered an inherently deadly weapon.  The instruction was not prejudicial under *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*), however, which is the controlling case on this issue.  The features of the instruction given, the prosecution's emphasis on the knife's *capability* of causing death or great bodily injury, the absence of a dispute from the defense about whether the knife was a deadly weapon, and other findings the jury made in rendering its verdict all establish the error was harmless.  Second, there is substantial evidence that the knife was used as a deadly weapon and, thus, that adequate evidence supports defendant's conviction for assault with a deadly weapon and the personal use of a knife enhancement the jury found true.  Third, the trial court did not abuse its discretion when excluding evidence of defendant's mental health history and mental illness diagnoses (and any error was harmless regardless).  The excluded testimony was not significantly probative of defendant's mental state when he committed the offense and the trial court

reasonably concluded any probative value was outweighed by the likelihood that presentation of the evidence would unduly consume time and confuse the jury.

> ### A. *The Instructional Error in Defining a Deadly Weapon Was Not Prejudicial*

To find a defendant guilty of assault with a deadly weapon, a jury must find, among other things, the defendant "did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person." (§§ 240, 245, subd. (a)(1); *People v. Williams* (2001) 26 Cal.4th 779; CALCRIM No. 875.) The court here instructed the jury with the former version of CALCRIM No. 875 that defined "deadly weapon" as a weapon other than a firearm "that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."[4]

"An 'inherently deadly or dangerous' weapon is a term of art describing objects that are deadly or dangerous in 'the ordinary use for which they are designed,' that is, weapons that have no practical nondeadly purpose." (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 318-319.) Because the sort of knife in defendant's possession has an ordinary, "innocent purpose" of

---

[4]     CALCRIM No. 875 has since been revised. It now states: "[A deadly weapon other than a firearm is any object, instrument, or weapon [that is inherently deadly or one] that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.]" The bench notes to the instruction state: "Give the bracketed phrase 'that is inherently deadly or one' and give the bracketed definition of inherently deadly only if the object is a deadly weapon as a matter of law."

9

cutting food, it is not an inherently deadly weapon. (*Aledamat*, *supra*, 8 Cal.5th at 6.) It may, however, "be a deadly weapon within the meaning of section 245, subdivision (a)(1) when used in a manner capable of causing and likely to cause death or great bodily injury." (*People v. Brown* (2012) 210 Cal.App.4th 1, 7.)

Defendant argues, and the People concede, it was error for the trial court to instruct the jury there were two alternate theories it could use to find defendant guilty of assault with a deadly weapon. While one theory—that the knife was used in a manner capable of causing and likely to cause death or great bodily injury—was legally correct, the other—that the knife was inherently deadly—was legally incorrect. We agree the instruction was erroneous for that reason. (*Aledamat, supra*, 8 Cal.5th at 6-7.)

The parties disagree, however, about whether the erroneous instruction was prejudicial such that reversal is required. Defendant contends the instruction was prejudicial because he believes the prosecution relied exclusively on the theory that the knife was a deadly weapon. The Attorney General disputes that and argues reversal is not required.

Our Supreme Court's decision in *Aledamat* sets the rules for the prejudice analysis we must undertake. In that case, the defendant was charged with assault with a deadly weapon in the form of a box cutter. The trial court instructed the jury with the former version of CALCRIM No. 875. (*Aledamat, supra*, 8 Cal.5th at 4.) By presenting the jury with both the inherently deadly and as-used definitions of a deadly weapon, the trial court instructed the jury with one legally incorrect theory (inherently) and one correct theory (as-used). (*Id*. at 7.) The Supreme Court

10

held this was error but found it harmless based on a "number of circumstances." (*Id*. at 13.)

One of those circumstances was the wording of former CALCRIM No. 875 itself. That wording (the same wording in the instruction here) juxtaposes "inherently deadly" with "used in such a way that it is capable of causing injury and likely to cause death or . . . great bodily injury" such that the instruction "at least indicates what the 'inherently deadly' language was driving at." (*Aledamat*, *supra*, 8 Cal.5th at 13-14.) Our Supreme Court also looked to the prosecution's closing argument in that case and found it was unlikely the jury would view the box cutter as inherently deadly without considering how it was used. The prosecutor there argued the box cutter was deadly because "'you wouldn't want your children playing with' it," and the Court emphasized "no one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon." (*Id*. at 14.) The Supreme Court also found it significant that the box cutter's status as a deadly weapon was not really a point of contention: while the defense attorney did not concede the box cutter was a deadly weapon, the attorney also did not argue it was not. (*Ibid*.)

These same considerations convince us the instructional error here was not prejudicial. The trial court gave the jury the same version of CALCRIM No. 875 as was at issue in *Aledamat*, and *Aledamat*'s point about the juxtaposition of the wording in the instruction accordingly obtains here too. (*Aledamat*, *supra*, 8 Cal.5th at 13-14.) In addition, the prosecution's closing argument here focused on the manner in which defendant used the knife. Specifically, the prosecution twice referred to what a knife can be used to do, not what it inherently does: "I don't think there's

11

anyone that doesn't know that a knife is capable of bodily injury, that a knife can be used as a dangerous or deadly weapon.  To be sure, the prosecution also remarked right after this that "you heard it from the defendant himself, he had a knife, 12-inch steak knife, that means it's a deadly weapon."[5]  But in context, coming right after what the prosecution said about how a knife can be used (implicitly conceding a knife can also be used in ways that are not deadly), we do not understand this subsequent remark as an assertion that the knife was an inherently deadly weapon.  Rather, the "that" to which the prosecution referred when saying "that means it's a deadly weapon" is best understood to refer to defendant's use of the knife, which showed it was capable of being used in a deadly, dangerous way.

Turning to defense counsel's closing argument, the circumstances are the same as in *Aledamat:* defense counsel did not concede the knife was a deadly weapon but also did not contest the characterization of the knife as capable of being used in deadly fashion.  The defense's approach on this point was sensible because, again as in *Aledamat*, contesting the point would have been futile based on the record.  (*Aledamat*, *supra*, 8 Cal.5th at 14 ["Counsel could readily believe it would be pointless . . . to argue that even if . . . the jury found defendant

---

[5]     Defendant appears to analogize this remark by the prosecution here to a Court of Appeal case that characterized an attorney's closing argument as "highly inflammatory and improper in many respects," that is, one that appealed to the passion or prejudice of the jury, asked for a guilty verdict based on sympathy for the deceased, and vilified counsel and witnesses.  (*People v. Talle* (1952) 111 Cal.App.2d 650, 676.)  The comparison is obviously inapt.

assaulted the victim with the box cutter, it was not a deadly weapon"].)  Though a 12-inch knife is not inherently deadly, it obviously has deadly potential when used to stab someone.  That potential would have been all the more apparent to the jury in light of defendant's contemporaneous threat to kill M.M.

The *Aledamat* court also reasoned it would have been impossible for the jury not to find the box cutter was capable of causing and likely to cause death or bodily injury based on the other facts the jury necessarily found in that case.  The court relied on the following findings that the jury made in convicting Aledamat of assault with a deadly weapon:  "(1) defendant did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) defendant had the present ability to apply force with a deadly weapon to a person." (*Aledamat*, *supra*, 8 Cal.5th at 15.)  The *Aledamat* court also explained "the jury must have considered the term 'inherently deadly' to mean *something*" and concluded that the jury would have necessarily found the box cutter deadly in the colloquial sense of the word: "readily capable of inflicting deadly harm." (*Ibid*.)  As a result, the court concluded "'[n]o reasonable jury that made all of these findings could have failed to find that defendant used the box cutter in a way that is capable of causing or likely to cause death or great bodily injury.' [Citation.]" (*Ibid*.)  The jury here, which made the same findings as the jury in *Aledamat*, similarly could not have done so without also finding defendant used the knife "in a way that is capable of causing or likely to cause death or great bodily

13

injury." (*Ibid*.)    Following *Aledamat*, the instructional error here was harmless.

### B.    *Substantial Evidence Supports Defendant's Assault with a Deadly Weapon Conviction*

Defendant challenges the sufficiency of the evidence supporting his conviction for assault with a deadly weapon in one respect: whether substantial evidence supports a finding that the knife was a deadly weapon under the sole legally correct theory, i.e., that it was used in a way that it was capable of causing and likely to cause death or great bodily injury.  When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the record "'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; see also Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

In undertaking the required substantial evidence inquiry, we are guided by the following principles.  "First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also '*likely to produce* death or great bodily injury.'" (*In re B.M.* (2018) 6 Cal.5th 528, 533 (*B.M.*).)  "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748 (*McDaniel*).)  Second,

the determination of whether the object is a deadly weapon rests on evidence of how a defendant actually used the object. (*B.M.*, *supra*, at 534.) "Third, although it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant. '[A] conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation], but limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id*. at 535.)

Here, defendant wielded a 12-inch knife and jabbed it toward M.M. when he was standing three feet away from M.M. Once extended, the knife was approximately two feet from M.M. The jury could reasonably infer the knife was sharp and capable of inflicting serious injury because defendant used it to cut his own arm while M.M. was watching. Though defendant did not actually cut M.M., the lack of injury does not indicate defendant's act of jabbing the knife toward M.M. was unlikely to produce serious bodily injury. An object can be a deadly weapon even if it does not actually produce a deadly result or grievous injury; there are many cases affirming assault with a deadly weapon convictions when the object used was "'some hard, sharp, pointy thing that was used only to threaten, and not actually used to stab.'" (*People v. Page* (2004) 123 Cal.App.4th 1466, 1471-1472 [pencil held against throat was a deadly weapon]; see also *In re D.T.* (2015) 237 Cal.App.4th 693, 699 [knife with a sharp blade more than two and a half inches long]; *People v. Simons* (1996) 42 Cal.App.4th 1100, 1106-1107 [screwdriver a deadly weapon when brandished at police officers].) From the way defendant wielded the knife, we conclude there is more than a mere possibility M.M.

15

would have suffered serious bodily injury if defendant had struck him while jabbing the knife at him.  The record thus contains substantial evidence defendant used the knife in a manner that was both capable of producing and likely to produce serious bodily injury.[6]

### C.    The Trial Court's Exclusion of the Mental Health Testimony Does Not Warrant Reversal

"Evidence Code section 352 provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' . . . '  [T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion

---

[6]    Defendant's reliance on the facts of *B.M.* to urge a different result is unavailing.  While *B.M.*, like this case, involved the use of a knife, that is where the salient similarities end.  The knife used in *B.M.* was a butter knife, which was "not sharp and had slight ridges on one edge of the blade." (*B.M.*, *supra*, 6 Cal.5th at 536.)  The defendant in *B.M.* used the knife on her sister's legs (which were covered by a blanket), there was no evidence the defendant attempted to use the knife on any exposed part of the sister's body, and the "moderate pressure that [defendant used] was insufficient to pierce the blanket much less cause serious bodily injury to [the victim]." (*Ibid.*)  Here, as already noted, defendant's 12-inch knife was sharp enough to cut skin and defendant jabbed the knife toward M.M., who was not protected by anything that would have stopped the progress of the knife had defendant made contact.

16

or consumption of time.  [Citation.]'"  (*People v. Williams* (2013) 58 Cal.4th 197, 270-271 (*Williams*).)

Evidence of a mental disease, defect, or disorder is admissible to demonstrate a defendant did not actually form the intent necessary for a particular crime.  (*People v. Coddington* (2000) 23 Cal.4th 529, 583, disapproved on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  (It is not, however, admissible to negate the capacity to form specific intent.  (§ 28, subd. (a); *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1362).)  The criminal threats charge against defendant is a specific intent crime: it "requires a threat of 'death or great bodily injury' with the specific intent that the statement be taken as a threat."[7]  (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292.)

Defendant contends the trial court abused its discretion and violated his constitutional rights to due process of law and a fair trial when it excluded testimony regarding his mental health. The trial court made two rulings pertinent to this argument, one granting the prosecution's motion in limine to exclude testimony by Dr. Scarf under section 352, and one granting the prosecution's later section 402 motion to preclude defendant from testifying about prior drug usage, mental health issues, or any

---

[7]     Assault with a deadly weapon, in contrast, is a general intent offense that does not require specific intent, and evidence of a defendant's mental illness cannot negate the requisite intent.  (*People v. Rocha* (1971) 3 Cal.3d 893, 899; *People v. Atkins* (2001) 25 Cal.4th 76, 91.)

17

hospitalizations or psychiatric care received before or after the offense.[8]

The defense made no offer of proof in the trial court as to what Dr. Scarf would say if called to testify. The doctor's report is therefore the only indication of her proposed testimony in the appellate record. It discusses three general categories of information: aspects of defendant's mental health history, defendant's performance on various cognitive tests administered by Dr. Scarf, and the diagnoses Dr. Scarf reached after conducting her assessment.

None of this information, however, was linked to defendant's mental state on the day of the offense, which means it had little if any probative value. Dr. Scarf's recitation of defendant's prior diagnosis of bipolar disorder—a disorder she did not include in her diagnosis of him—and his other mental health history was obtained solely from her interview with defendant. The report does not state Dr. Scarf reviewed any records that might have provided independent support for defendant's assertions. Additionally, other than the 2018 hospitalization that defendant attributed to methamphetamine use, defendant's own statements to Dr. Scarf did not suggest any of these historical factors were temporally proximate to the date

---

[8] To the extent defendant contends the trial court should have permitted the introduction of a separate report detailing an evaluation pursuant to section 1368, that contention is forfeited because defendant did not seek to have the evidence admitted below. (*People v. Seijas* (2005) 36 Cal.4th 291, 301 ["questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal"].)

of the offense (and there is no evidence proving defendant was under the influence of methamphetamine when he threatened and assaulted M.M.).

The results of Dr. Scarf's cognitive tests of defendant similarly were not linked to his behavior on the date of the offense. Further, even if the tests could be seen as relevant to defendant's state of mind on the day of the assault, the results indicated defendant's thought process was linear and his intellectual capacity and reading ability ranged between average and high-average. Thus, if anything, the test results would suggest defendant did form the requisite intent to commit the criminal threats offense.

Finally, Dr. Scarf's report does not link the diagnoses she rendered in May 2018 to defendant's state of mind on the day of the incident, which occurred months earlier. Nor does the report indicate those diagnoses would support an inference defendant had not formed the requisite intent to threaten M.M. With low or no probative value, the trial court stayed within the bounds of its discretion when it determined calling Dr. Scarf as a witness presented an unwarranted risk of confusing the issues and would unduly consume time.

Defendant acknowledges Dr. Scarf's report does not "specifically" address how his diagnoses might have affected his mental state at the time of the offense, but he argues the omission does not mean the information could not have been elicited and he contends it was error for the trial court not to hold a further hearing under Evidence Code section 402. The first of these contentions is unavailing because he made no offer of proof as to how the diagnoses could be connected to his mental state. (*People v. Anderson* (2001) 25 Cal.4th 543, 580-581 ["a judgment

19

may not be reversed for the erroneous exclusion of evidence unless 'the substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means'"].) The latter of these contentions is forfeited because defendant did not ask the court to conduct an Evidence Code section 402 hearing so Dr. Scarf could describe her anticipated testimony in more detail. (*In re Seaton* (2004) 34 Cal.4th 193, 198.)

Defendant additionally urges it was error for the trial court to rule he could not testify regarding his own mental health history and his state of mind immediately preceding and following the incident, arguing the evidence would have bolstered his credibility. This argument is flawed for three reasons. First, the trial court's ruling did not prevent defendant from testifying regarding his state of mind "immediately preceding and immediately following" the incident; the trial court did not limit defendant's testimony to the exact moment of the offense. Rather, the trial court ruled the relevant issue was defendant's state of mind and mental capacity on the day of the incident. Second, defendant did not advance this credibility argument below, where he argued only that his mental health history was relevant to his state of mind, not his credibility. Third, to the extent defendant argues his testimony would have been relevant to his intent, defendant did not detail for the trial court the testimony he would have provided regarding his mental health history and thus did not demonstrate how it would have indicated he did not form the requisite intent that M.M. understand his statement as a threat. Without an offer of proof showing a connection between his proposed testimony and his

20

behavior during the incident, we cannot fault the trial court's decision.[9]

Even assuming for argument's sake that the trial court's evidentiary rulings were erroneous under the abuse of discretion standard, it is still true that "'[a]pplication of the ordinary rules of evidence . . . [generally] does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*).) Thus, for our purposes, "the proper standard . . . [for assessing prejudice] is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [*Watson*] . . . , and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24 . . . )." (*Fudge*, *supra*, 7 Cal.4th at 1103.)

The trial court did not refuse to allow defendant to present a complete defense; it excluded only some evidence the defense wanted to present. (See *Fudge*, *supra*, 7 Cal.4th at 1102-1103.) Defendant was allowed to testify—and did testify—about his mental state on the day of the incident. He claimed he was

---

[9] Defendant's reliance on *People v. Moss* (2003) 109 Cal.App.4th 56 (*Moss*) is improper. The case was superseded by grant of review and is not citable.

21

suicidal and was talking to himself at the time of the offense. He also testified he had cut himself to alleviate pain he was feeling and did not recall encountering M.M. or pointing a knife at him. Assuming the excluded testimony regarding his diagnosis, months later, of stimulant use and unspecified anxiety disorders was relevant to bolster this testimony, its exclusion did not preclude "*all* testimony about the accused's own diagnosis, or mental condition, at the time of the offense." (*People v. Cortes* (2011) 192 Cal.App.4th 873, 909.) Accordingly, reversal is not warranted unless it is "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at 836.)

That is not the case here. Nothing in the evidence the trial court excluded connected defendant's mental health diagnoses or methamphetamine hospitalization to the absence of a specific intent to threaten M.M. It is thus not reasonably probable that the admission of the evidence would have led the jury to find defendant did not intend for M.M. to understand his statement, made while he was jabbing a knife at M.M., as a threat.

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:



RUBIN, P. J.



KIM, J.